UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
MILWAUKEE DIVISION

| | |
|---|---|
| FTUTB, INC., <br><br> *Plaintiff*, <br><br> v. <br><br> BHUPINDER SINGH SAINI, <br> YOGENDRA BHARAT, <br> DERMOT MORE-O'FERRALL, <br> NAVTEJ PUREWAL, and <br> KOSTANDINOS TSOULFAS, <br><br> *Defendants*. | No. |

## COMPLAINT

Plaintiff FTUTB, INC., by and through its attorney, Blank Rome LLP, bring this Complaint against defendants BHUPINDER SINGH SAINI, YOGENDRA BHARAT, DERMOT MORE-O'FERRALL, NAVTEJ PUREWAL, and KOSTANDINOS TSOULFAS, (collectively, the "Defendants"), and states as follows:

### Nature of Action

1. Defendants are physicians who specialize in pain treatments and pain management and who are or recently were employed by Advanced Pain Management, S.C. ("APM SC"). Since in or around 2008, APM SC has been in a management services agreement with APM Wisconsin MSO, LLC ("APM Wisconsin"), a subsidiary of Advanced Pain Management Holdings, Inc. ("APMH"). Through that agreement, APM Wisconsin and APMH provided management, administration, purchasing services and support, and other management support needs to APM SC. APMH and its affiliates provide support to companies that provide pain treatments to 43,000 patients in Wisconsin and Minnesota. Aside from being employed by APM SC, each Defendant held stock in APMH's parent entity.

2. Rather than devoting their entire professional time and efforts to APM SC, Defendants began performing pain treatments and/or held an ownership interest in a direct competitor to APMH, Wisconsin Surgery Center, LLC ("Wisconsin Surgery"). In exchange for services APM Wisconsin provided to APM SC in support of physician services, APM SC owed and paid fees to APM Wisconsin. When the Defendants wrongfully competed against APM SC by working for Wisconsin Surgery, Defendants caused the revenue from those procedures to be diverted away from APM SC, and ultimately APMH, in breach of their employment contracts.

3. This suit is brought by the administrative agent to APMH's secured lenders ("Secured Lenders"), FTUTB. In or around 2013, the Secured Lenders made a $145 million loan commitment to APMH pursuant to a credit agreement (the "Credit Agreement"). As part of the Credit Agreement, APMH pledged its present and future accounts receivable, among other assets, as collateral. Because the contractual relationship between APM SC and APM Wisconsin required APM SC to pay a portion of revenues generated from the Defendants' services to APM Wisconsin, the Defendants' performance of competing procedures at and on behalf of Wisconsin Surgery and other third parties, as well as on their own behalf, wrongfully diverted collateral and tortiously interfered with the Credit Agreement. FTUTB also asserts related conspiracy claims, as the Defendants performed these procedures with the support and direction of Vishal Lal, in his capacity as the CEO and executive director of Wisconsin Surgery.[1] On information and belief, Defendant Saini also advised Lal—who is the subject of a separate, related suit for fraud, tortious interference, and conversion—on the management of Wisconsin Surgery Center.

4. FTUTB and the Secured Lenders have an immediate possessory interest in and rights to the collateral staked by APMH for the loan. FTUTB and the Secured Lenders have

---

[1] Lal simultaneously served as CEO of APMH, a role from which he was fired in 2019.

suffered substantial money damages in an amount to be determined at trial. And money damages alone are inadequate. Defendants should be enjoined from competing with APM SC; converting the collateral by continuing to provide services on behalf of Wisconsin Surgery, other third parties, or themselves; or otherwise interfering with the rights of the Secured Lenders under the Credit Agreement.

## Jurisdiction and Venue

5. The Court has diversity jurisdiction over this action pursuant to 28 U.S.C § 1332. FTUTB, Inc. is a corporation incorporated in Delaware with its principal place of business in New York. Upon information and belief, Defendants Saini, Bharat, More-O'Ferrall, Purewal, and Tsoulfas are citizens of Wisconsin. There is complete diversity of citizenship between Plaintiff and Defendants, and the amount in controversy is well in excess of the statutory minimum of $75,000.

6. Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because the events giving rise to the controversy occurred within the Milwaukee Division of the Eastern District of Wisconsin.

7. This Court has personal jurisdiction over Defendants because the acts and omissions that are the bases of the claims set forth herein occurred in this judicial district.

## Parties

8. Plaintiff FTUTB is the administrative agent for the Secured Lenders to APMH.

9. Defendant Bhupinder Singh Saini is a medical doctor licensed to practice in Wisconsin.

10. Defendant Yogendra Bharat is a medical doctor licensed to practice in Wisconsin.

11. Defendant Dermot More-O'Ferrall is a medical doctor licensed to practice in Wisconsin.

12. Defendant Navtej Purewal is a medical doctor licensed to practice in Wisconsin.

13. Defendant Konstandinos Tsoulfas is a medical doctor licensed to practice in Wisconsin.

## Factual Allegations

### I. Background Concerning Relevant Entities

14. APMH is the parent company of a group of businesses engaged in providing administrative support to companies that provide safe, interventional pain management procedures and therapies. APMH and its subsidiaries and affiliates work with dozens of specialized healthcare providers at health centers throughout the Midwest.

15. APM SC is a Wisconsin service corporation that is in the business of treating patients for pain, pain management, and pain medicine. At all relevant times, APM SC employed physicians in a variety of fields, including anesthesiology, neurology, and rehabilitative medicine. Each of the Defendant physicians signed an employment contract with APM SC. Among the terms in each employment contract were non-compete, non-solicitation, confidentiality, and remedies provisions. In general, each Defendant promised to devote his entire professional time and effort to APM SC, and confirmed that he would not compete with APM SC while employed by APM SC and for two years following termination of employment.

16. Each Defendant further promised not to solicit any patient for the purposes of providing goods or services in competition with APM SC while employed by APM SC and during that same two-year, post-employment period. Additionally, each Defendant promised that, while employed by APM SC and for two years after, he would not solicit any person who was any employee of APM SC to work for any entity that competes with APM SC. Each Defendant agreed to maintain the secrecy of certain confidential information he learned while employed by APM SC. And each Defendant agreed that as a result of a breach of any of these provisions, APM SC would

4

be entitled "to preliminary and permanent injunctive and other equitable relief" against each doctor in breach.

17. At all relevant times, APM Wisconsin was a management services company. On or about May 1, 2008, APM Wisconsin entered into a management services agreement with APM SC, and pursuant to that agreement, APM Wisconsin provided management, administration, purchasing services and support, and other management support needs to APM SC. In exchange for these services, APM SC generated fees from support for physician services that it owed and paid to APM Wisconsin under the management services agreement. In other words, APM SC was obligated to pay APM Wisconsin a fee that was calculated as the revenue of APM SC, less APM SC's expenses. Due at least in part to Defendants' malfeasance and conversion, there is currently a shortfall of $6.6 million between APM SC's expenses and its revenues, all of which APM SC owes to APM Wisconsin.

18. On or about February 26, 2013, APMH, as borrower, entered into the Credit Agreement with the Secured Lenders and the administrative agent, FTUTB's predecessor. Simultaneous with the closing of the Credit Agreement, and using funds borrowed through the Credit Agreement, APMH finalized a dividend recapitalization transaction. Pursuant to this dividend recapitalization, about $48 million of the loan procured from the Secured Lenders was used to fund a special dividend to APMH's equity holders, including five of the six Defendants. At closing, advances from Secured Lenders under the Credit Agreement funded special dividend payments to Defendants Saini, Bharat, and More-O'Ferrall of over $900,000 each, a payment of over $270,000 to Defendant Purewal, and a payment of over $100,000 to Defendant Tsoulfas.

19. According to the terms of the Credit Agreement, APMH and its affiliates agreed to grant the Secured Lenders' administrative agent first-priority security interests in all "collateral"

and to take all necessary steps to preserve and protect the collateral during the period of the loan. Per the terms of the Credit Agreement, the fees generated by APM SC from services performed by Defendants, which APM SC owed to APM Wisconsin in exchange for services performed by APM Wisconsin under the management services agreement, constituted collateral pledged by APMH to satisfy obligations to the Secured Lenders under the Credit Agreement. Additionally, technical fees derived directly by APM Wisconsin in connection with those services also constituted collateral. When Defendants performed treatments and procedures at Wisconsin Surgery, instead of at APM SC, they reduced these fees and thereby reduced the Secured Lenders' collateral.

## II. Defendants' Conversion of APMH's Loan Collateral

20. One of Wisconsin Surgery's specialties is pain management, meaning that Wisconsin Surgery has been directly competing with APMH's affiliated entities and continues to do so. Defendants' employment contracts prohibited them from working for a competitor while employed by APM SC, and for two years thereafter. Yet on information and belief, Defendants—for years—conducted patient visits and performed patient services relating to pain management at and on behalf of Wisconsin Surgery in competition with APM SC and APMH. In fact, beginning no later than in or around February 2019 and continuing until as recently as in or around May 2020, Bharat, Purewal, and Tsoulfas were listed under the "Pain" section of Wisconsin Surgery's website.

21. Saini holds or has held an ownership stake in Wisconsin Surgery, serves or has served on Wisconsin Surgery's board of directors, and on information and belief, advises Lal on Wisconsin Surgery management issues.

22. Indeed, in or around early 2017, Saini applied to a Wisconsin Surgery affiliate for appointment and clinical privileges. A true and correct copy of a February 1, 2017 email

discussing Saini's application is attached hereto as Exhibit A. At the time, Saini was employed by APM SC and had a covenant in his APM SC employment not to compete against APM SC. Nevertheless, on information and belief, Saini was granted appointment and clinical privileges and regularly performed pain treatment and management services at and on behalf of Wisconsin Surgery.

23. Beginning in or about December 2017, Saini ceased work for APM SC, claiming that he was unable to perform due to a disability. Specifically, Saini claimed that he suffered constant pain and was unable to move his neck or stand on his feet. Dr. Saini also drew disability benefits pursuant to an APM affiliate's insurance policy.

24. APM has looked into potential fraud claims involving Saini's disability claims. Specifically, subsequent to his ceasing work, he was observed performing feats inconsistent with his claimed disability.

25. Bharat worked for Wisconsin Surgery in breach of his own duties to APM SC and employment agreements. On information and belief, Bharat also has an ownership stake in Wisconsin Surgery. More-O'Ferrall has also held a direct or indirect ownership stake in Wisconsin Surgery and, upon information and belief, has been performing pain treatments for Wisconsin Surgery in breach of his duties to APM SC and employment agreement. Upon information and belief, Purewal and Tsoulfas have been performing pain treatments for Wisconsin Surgery in breach of their duties to APM SC.

26. By working for Wisconsin Surgery and not APM SC, Defendants have tortiously interfered with APMH's Credit Agreement with Secured Lenders and have converted the collateral of the Secured Lenders—the rights to fees payable from APM SC to APM Wisconsin derived from

services performed in support of the Defendants' revenue streams and earning potential as well as technical fees.

27. APMH first defaulted on the Credit Agreement in or around 2015 and has regularly been in default since that time. On information and belief, Defendants have at all relevant times been aware of the Credit Agreement, aware that APMH was in default, and aware that the Secured Lenders have a first-priority security interest in the collateral. By performing work in competition with APM SC in violation of their contracts, Defendants knowingly converted collateral away from APMH and intentionally interfered with APMH's contractual obligation to preserve that collateral for the benefit of the Secured Lenders. Defendants' performance of services for Wisconsin Surgery and diversion of proceeds from APM SC, APMH, and their affiliates constitutes conversion of the Secured Lenders' collateral and has caused the Secured Lenders harm. Indeed, APMH is now insolvent and is preparing to liquidate its assets in a process that will leave the Secured Lenders with a massive loss.

28. The Secured Lenders have suffered substantial money damages to be determined at trial. Yet, money damages alone would not provide an adequate remedy for Defendants' conspiracy, conversion, and tortious interference. Accordingly, FTUTB seeks injunctive relief enjoining Defendants and all those acting in concert with them from converting the Secured Lenders' collateral, competing with APM SC, or otherwise interfering with the business of APMH and its affiliates.

## Claims for Relief

### COUNT ONE
*Conversion,*
*Against All Defendants*

29. The preceding and succeeding Paragraphs are incorporated herein by reference.

30. The revenue generated by, and the earning potential of, Defendants under employment contracts with APM SC created fees owing by APM SC to APM Wisconsin under their management services agreement, and those fees constituted collateral pledged by APMH to satisfy obligations to FTUTB and the Secured Lenders under the Credit Agreement. As a result of Defendants working for Wisconsin Surgery while under contract to work for and not compete against APM SC, that collateral was wrongfully transferred from APMH to Wisconsin Surgery.

31. APMH is in default of the Credit Agreement, and as such, FTUTB is entitled to exercise remedies to enforce possession of the collateral.

32. Defendants transferred this collateral without the consent of APMH or FTUTB, which resulted in serious interference with the rights of FTUTB and the Secured Lenders as well as their abilities to possess that collateral.

33. Defendants' conversion proximately caused injuries in an amount to be determined at trial.

### COUNT TWO
*Tortious Interference with Contract,*
*Against All Defendants*

34. The preceding and succeeding Paragraphs are incorporated herein by reference.

35. FTUTB and the Secured Lenders have been in and remain in a Credit Agreement with APMH.

36. Defendants interfered with the contractual relationship between APMH, on the one hand, and FTUTB and the Secured Lenders, on the other. Defendants worked for Wisconsin Surgery and not for APM SC. As a result, APM Wisconsin and APMH lost the rights to fees payable from APM SC from Defendants' revenue streams and earning potential, as well as technical fees that APM Wisconsin would have derived directly, meaning that APMH and APM Wisconsin did not have those fees available to repay the Secured Lenders, nor as collateral

as required by the Credit Agreement. Defendants thus caused APMH not to be able to abide by the terms of the Credit Agreement requiring APMH to preserve and protect the collateral during the period of the loan.

37. Because Defendants competed with APM SC when they knew that they were under contract to work for and not compete with APM SC, this interference by Defendants was intentional. Furthermore, upon information and belief, Defendants knew that the Credit Agreement required APMH to preserve the collateral and that they were impairing the collateral by working for and on behalf of Wisconsin Surgery.

38. No Defendant had any contractual right or other privilege to interfere with APMH's ability to perform under the Credit Agreement.

39. Defendants' tortious interference with contract proximately caused substantial injuries to FTUTB and the Secured Lenders in an amount to be determined at trial.

**COUNT THREE**
*Conspiracy to Commit Conversion and Tortious Interference with Contract,*
*Against All Defendants*

40. The preceding and succeeding Paragraphs are incorporated herein by reference.

41. On information and belief, Defendants were recruited to work for Wisconsin Surgery by Vishal Lal, the CEO and executive director of Wisconsin Surgery and former CEO of APMH, while Lal was still employed by APMH. On information and belief, Saini also advised Lal on the management of Wisconsin Surgery as late as 2017 and was aware of Lal's widespread recruitment of APM SC doctors.

42. Defendants, along with Lal and Wisconsin Surgery, knew that by virtue of Defendants working for Wisconsin Surgery, Defendants would cause the conversion of APMH's collateral to Wisconsin Surgery and would tortiously interfere with APMH's ability to abide by the terms of the Credit Agreement.

43. Pursuant to this conspiracy, Defendants performed patient work on behalf of Wisconsin Surgery and not for the benefit of APM SC or its affiliates. While Defendants worked for Wisconsin Surgery, they continued to receive compensation from APM SC per the terms of their employment contracts.

44. Meanwhile, because each Defendant signed his own employment agreement acknowledging his understanding of the terms of that agreement, each Defendant knew that his employment agreement prohibited him from working for a competitor. Each Defendant was paid by APM SC while he also worked for and on behalf of Wisconsin Surgery. In addition, on information and belief, Defendants Saini, Bharat, and More-O'Ferrall held their own minority ownership positions in Wisconsin Surgery.

45. Defendants' conspiracy with Lal and Wisconsin Surgery proximately caused substantial injuries to FTUTB and the Secured Lenders in an amount to be determined at trial.

## Request for Relief

46. WHEREFORE, Plaintiff prays that the Court:

- Award Plaintiff compensatory, consequential, and punitive damages in an amount to be determined at trial;

- Enter preliminary and permanent injunctive relief enjoining Defendants and those acting in concert with them from interfering with existing contracts or the possible sale of APMH;

- Impose a constructive trust against each Defendant;

- Award pre-judgment interest in favor of Plaintiff;

- Award Plaintiff attorneys' fees and expenses; and

- Grant such additional relief as the Court finds appropriate and just.

## Jury Demand

47. Plaintiff FTUTB, Inc. hereby requests trial by jury.

Dated this 28th day of August, 2020.

    By: *s/ Daniel T. Flaherty*
    Daniel T. Flaherty, SBN 1011357
    David R. Konkel, SBN 1097244
    GODFREY & KAHN, S.C.
    833 East Michigan Street, Suite 1800
    Milwaukee, WI 53202-5615
    Phone: 414-273-3500
    Fax: 414-273-5198
    dflaherty@gklaw.com
    dkonkel@gklaw.com

-and-

    William J. Dorsey
    Paul H. Tzur
    BLANK ROME, LLP
    444 W. Lake Street, Suite 1650
    Chicago, Illinois 60606
    Phone: 312-776-2600
    Fax: 312-776-2601
    wdorsey@blankrome.com
    ptzur@blankrome.com

*Attorneys for Plaintiff FTUTB, Inc.*

22799941.3